UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

United States of America

v. No. 19-cr-241-01-JL
Opinion No. 2021 DNH 138P

Francis Harrington

**MEMORANDUM ORDER**

In advance of his trial on one count of possession with intent to distribute a controlled substance, see 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vi), defendant Francis Harrington filed a motion to suppress evidence.[1] The motion turns on whether the police conducted a constitutionally permissible detention and pat-down[2] search of Harrington, such that the resulting seizure of controlled substances from Harrington's person and inculpatory statement by Harrington can stand.

After an evidentiary hearing, additional briefing at the court's request, and oral argument, the court denied Harrington's motion. At Harrington's request, the court held a second evidentiary hearing on the suppression motion. That hearing did not change the court's ruling. This order will explain the bases for the court's denial of the suppression motion in greater detail. See, e.g., United States v. Joubert, 980 F. Supp. 2d 53, 55 n.1 (D.N.H. 2014), aff'd, 778

[1] See Doc. no. 8.

[2] For purposes of this order, the court will use the terms "pat-down," "pat-frisk," "frisk," and "pat-search" interchangeably, as those terms generally share the same meaning in the law.

F.3d 247 (1st Cir. 2015) (citing In re Mosley, 494 F.3d 1320, 1328 (11th Cir. 2007) (noting a district court's authority to later reduce its prior oral findings and rulings to writing)).[3]

As it did at the hearing, the court concludes that neither the controlled substances seized from Harrington's person nor his inculpatory statement must be suppressed. The police had ample suspicion of criminal activity to detain the vehicle in which Harrington was a passenger and extend that detention to continue their investigation. The officer also had sufficient reasonable suspicion of criminal activity and reasons to suspect that Harrington was armed and posed a danger to others to justify ordering him out of the vehicle and patting him down. Lastly, because Harrington's inculpatory statement was made in the context of a brief roadside investigatory detention, and not a custodial interrogation, it was not procured in violation of his Fifth Amendment right against self-incrimination.

## I. Applicable legal standard

Harrington bears a threshold burden to show a Fourth Amendment violation in support of his motion to suppress. United States v. Young, 835 F.3d 13, 19 (1st Cir. 2016); see also Rakas v. Illinois, 439 U.S. 128, 132 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."). This includes the "burden of establishing that he was seized" or searched without a warrant. United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016). Once Harrington shows that a warrantless search or seizure occurred, the government bears the burden of proving, by a preponderance of the evidence, that the warrantless search or seizure was nevertheless lawful. See United States v. Matlock, 415 U.S. 164, 178 n. 14 (1974) ("[T]he controlling burden of proof

[3] To the extent there is any inconsistency between the factual and legal findings in the court's oral orders and its written order, this order controls.

at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." (citing Lego v. Twomey, 404 U.S. 477, 488-89 (1972)); United States v. Schaefer, 87 F.3d 562, 569 (1st Cir.1996) ("The government bears the burden of proving by a preponderance of the evidence that" the consensual search exception to the warrant requirement applies).

## II. Background

The court makes the following findings of fact based on the testimony and other evidence received at the suppression hearings. The government called Manchester Police Officer James Pittman as a witness at the suppression hearings. Harrington called no witnesses. The parties also entered several exhibits into evidence at the hearings.

On August 22, 2019, at approximately 8:30 A.M., Officer James Pittman of the Manchester Police Department responded to an anonymous call requesting that an officer check the condition of two males who were reportedly passed out in a Chevrolet Impala.[4] The caller reported witnessing the two individuals exit and return to the vehicle prior to passing out.[5] The vehicle was parked across from the Red Arrow Diner at 61 Lowell Street in Manchester, New

[4] Transcript for Aug. 25, 2020 Hearing on Motion to Suppress (doc. no. 35) [hereinafter "T."], 5:11-12; 6:16-18; 6:24-7-2; 26:2-5. During this court's suppression hearings, the parties also referenced and by agreement provided a copy of a transcript from an August 29, 2019 evidentiary "dangerousness" or continued detention hearing that took place at the Hillsborough County Superior Court North in the matter of State of New Hampshire v. Francis Harrington, docket number 216-2019-CR-01492. Officer Pittman testified at this state court hearing as well. The court will refer to the testimony from this hearing as "State T."

[5] T. 7:1-2.

Hampshire, a commercial area with some apartments nearby.[6] The Manchester Police Department has long considered this a high volume area for both crime and drug activity.[7]

Officer Pittman was the first to arrive at the location.[8] He located the vehicle, parked behind it, and approached the driver's side.[9] Within 30-60 seconds of Officer Pittman's arrival, emergency medical personnel also arrived on the scene.[10] Officer Pittman observed the driver sitting in the vehicle, appearing to be sleeping with his chin touching his chest.[11] The officer also noticed a second occupant who appeared to be sleeping in the passenger seat; this occupant was later identified as the defendant, Francis Harrington.[12]

Officer Pittman approached the driver and woke him up.[13] The driver appeared lethargic, and his eyes were bloodshot.[14] Officer Pittman asked the driver to step out of the vehicle.[15] The driver immediately complied, and when he exited the vehicle, Officer Pittman noticed that the driver's pupils looked glassy and pinpointed.[16] Based on his observations and experience,

---

6 T. 12:22-23; 13:11-22.

7 See generally Second Evidentiary Hearing Testimony, April 22, 2021.

8 T. 7:15-16.

9 T. 7:9-10.

10 T. 7:17-21; State T. 14:13-15:1.

11 T. 7:23-8:2.

12 T. 15:13-25.

13 T. 8:4-8.

14 T. 8:2; 8:18-19.

15 T. 8:2-3.

16 T. 8:19-21.

Officer Pittman believed that the driver may have been under the influence of opioids or other narcotics.[17]

Officer Pittman then conducted a pat-search of the driver and discovered no weapons.[18] The driver denied being impaired or otherwise engaging in any illegal activity, and the pat search did not uncover anything.[19] As Officer Pittman was interacting with the driver, emergency medical personnel were speaking with Harrington on the passenger side of the vehicle.[20]

Next, Officer Pittman approached the passenger side of the vehicle to assist the medical personnel with Harrington.[21] One of the medical responders told Officer Pittman that Harrington was not acting normal; the medical responder nodded to Officer Pittman as he approached, suggesting to Officer Pittman that the medical personnel were uncomfortable dealing with Harrington without the police there.[22] Officer Pittman attempted to speak to Harrington, who appeared lethargic. Harrington either delayed his reaction to, or did not answer, the officer's verbal contact.[23] Harrington's eyes were half shut and he was swaying from side to side.[24]

---

[17] T. 17:1-5; State T. 16:16-20.

[18] T. 8:23-24.

[19] T. 9:7-8; 19:5-14.

[20] T. 19-23; State T. 16:9-11.

[21] T. 9:21-23.

[22] T. 9:25-10:1; State T. 17:2-8.

[23] T. 20:2-4.

[24] T 10:1-2; 2:4; State T. 18:18-22.

Harrington also reached around inside the vehicle and reached between the seats in the center console area of the vehicle.[25]

Officer Pittman asked Harrington to step out of the vehicle.[26] Harrington delayed exiting the vehicle, continued to sway from side to side, and reached down to the floor in the area between the passenger seat and the passenger side door.[27] As Harrington exited the vehicle, he continued to demonstrate a slow and lethargic physical state.[28] Officer Pittman next instructed Harrington to place his hands on top of his head.[29] Harrington responded by putting one hand up, but he moved his other hand toward his pocket.[30] Officer Pittman grabbed Harrington's noncompliant arm, placed it on top of Harrington's head, and began to pat Harrington down.[31] While running his hand over the front of Harrington's waistband, Officer Pittman felt a large, solid object, which he believed could have been a weapon.[32] He asked Harrington what the object was, and Harrington replied that it was "drugs."[33]

25 T. 31:15-18.

26 T. 10:8-9.

27 T. 10:12-13; 31:19-20; 32:10-18. Officer Pittman initially testified that the passenger door was closed when he first encountered Harrington, but later acknowledged that it might have been open. It is not clear, however, whether the door was completely open or just slightly open. Either way, how open the door was is not particularly relevant, as Officer Pittman consistently testified that Harrington reached down to the floor and Officer Pittman did not know what Harrington was reaching for, which concerned him.

28 T. 10:14-25.

29 T. 10:25-11:3; 21:18-20.

30 T. 11:2-3.

31 T. 11:4-9.

32 T. 11:11-12.

33 T. 11:14-16.

Officer Pittman then handcuffed Harrington and removed the object, which appeared to be a large plastic bag containing four brown baggies with a brownish-tan substance.[34] Based on his training and experience, Officer Pittman suspected that the substance was either fentanyl or heroin.[35] Officer Pittman then placed Harrington under arrest.[36] Manchester Police later sent the object recovered from Harrington during the search to the state lab for testing.[37] Lab results confirmed that it contained approximately 200 grams of heroin and fentanyl.[38] On November 27, 2019, a grand jury charged Harrington with Possession with Intent to Distribute a Controlled Substance, 21 U.S.C. §§ 841(a)(1) & (b)(1)(B)(vi).[39]

## III. Analysis

Harrington challenges all aspects of his encounter with Officer Pittman. First, he argues that Officer Pittman's initial detention of the vehicle and its occupants was not justified and therefore violated the Fourth Amendment. He next argues that Officer Pittman violated the Fourth Amendment by impermissibly extending his engagement with the vehicle. He further argues that Officer Pittman's decision to order him out of the vehicle and pat-frisk him was not constitutionally permissible. Finally, Harrington argues that his statement to Officer Pittman that he possessed drugs should be suppressed because it was the unlawful product of a custodial

---

[34] T.11:16-20; 35:9-11; State T. 7:12-15.

[35] T. 24:12-14.

[36] T. 12:7-9.

[37] T. 11:22-12:1.

[38] T. 12:5-8.

[39] Doc. no. 1.

interrogation, without the benefit of the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966). The court addresses each argument in turn.

**A. The initial engagement with the vehicle**

Although Officer Pittman did not "stop" the vehicle at issue because it was parked with occupants sleeping, this court will assume that his encounter with the vehicle and its occupants was an investigatory stop or detention, and therefore a seizure, within the meaning of the Fourth Amendment. See Brendlin v. California, 551 U.S. 249, 251 (2007) (holding that "[w]hen a police officer makes a traffic stop . . . a passenger is seized as well and so may challenge the constitutionality of the stop"); Delaware v. Prouse, 440 U. S. 648, 653 (1979) ("[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief.") (citations omitted); see also United States v. Fields, 823 F.3d 20, 25 (1st Cir. 2016) (an officer's interaction with a person becomes a seizure when the officer makes a "show of authority," which occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). A seizure or other "curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980) (citations omitted).

Here, Officer Pittman was responding to an emergency call to check the condition of two people "passed out" in a vehicle parked in a high crime, high drug activity area of the city, during daylight hours. The caller reported that the individuals had left and returned to the vehicle. Based on his training and experience, this suggested to Officer Pittman that the individuals may be engaged in illegal drug activity, or that the driver of the vehicle was

impaired. His engagement with the vehicle was therefore supported by a reasonable and articulable suspicion that its occupants were engaged in criminal activity and did not violate the Fourth Amendment.[40]

**B. The extension of the stop**

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution," such as when an encounter is impermissibly extended temporally. Illinois v. Caballes, 543 U.S. 405, 407 (2005). Harrington argues that Officer Pittman impermissibly extended the seizure after any initial concerns about the vehicle's occupants being passed out were "dispelled." The court disagrees. Officer Pittman's concerns about the occupants' possible impairment or use of illegal drugs, see supra Part III A, were not dispelled simply because they woke up. Rather, the driver of the vehicle showed obvious signs of impairment both before and after Officer Pittman ordered him out of the vehicle and searched him. Based on his training and experience, Officer Pittman suspected that the driver was under the influence of opioids. Harrington showed similar signs of

[40] Alternatively, the initial encounter may have also been justified under the community caretaking doctrine. Under the doctrine, "police action can be constitutional notwithstanding the fact that it constitutes a seizure." Lockhart-Bembery v. Sauro, 498 F.3d 69, 75 (1st Cir. 2007) (emphasis in original). Recognized community caretaking functions include combating actual hazards, preventing potential hazards from materializing, alleviating dangerous roadside conditions, and responding to emergencies requiring the officer's attention. See United States v. Gemma, 818 F.3d 23, 31 (1st Cir. 2016); Lockhart-Bembery, 498 F.3d at 71-72; United States v. Harris, 747 F.3d 1013, 1017 (8th Cir. 2014). The doctrine "gives officers a great deal of flexibility in how they carry out their community caretaking function," and the "ultimate inquiry is whether, under the circumstances, the officer acted 'within the realm of reason,'" taking into account "the various facts of the case at hand." Lockhart-Bembery, 498 F.3d at 75 (quoting United States v. Rodriguez-Morales, 929 F.2d 780, 786 (1st Cir. 1991)). Officer Pittman responded to a call for a "check condition" of two men passed out in a vehicle parked on a city street. His engagement with the vehicle could therefore have fallen under the community caretaking functions of responding to emergencies or alleviating dangerous roadside conditions, as just two examples.

drug impairment. It goes without saying, and was conceded by defense counsel at oral argument, that both operating a vehicle while under the influence of drugs and using or possessing certain controlled substances are criminal activities. Officer Pittman thus had continued reasonable suspicion of criminal activity to extend the encounter. See Rodriguez v. United States, 575 U.S. 348, 354 (2015) ("Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address [violation of law] that warranted the stop and attend to related safety concerns.") (citation omitted).

While Officer Pittman ultimately did not subject the driver to a field sobriety test, his suspicion that the driver may have been impaired had not dissipated while Officer Pittman was interacting with Harrington. Officer Pittman instead was unable to conclusively evaluate the driver's condition because his attention quickly turned to Harrington, whose behavior had seemingly made emergency medical personnel uncomfortable.[41] Under these circumstances, Officer Pittman was allowed to check on both the driver and passenger before ending the encounter, and there was no evidence to suggest that Officer Pittman was impermissibly trying to extend the stop to develop probable cause. Cf. Arizona v. Johnson, 555 U.S. 323, 333 (2009) ("The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.").

**C. Removing Harrington from the vehicle**

Harrington also challenges Officer Pittman's decision to order him out of the vehicle. Having lawfully started an investigatory detention of the vehicle, however, Officer Pittman's decision to order Harrington out of the vehicle during the encounter was constitutionally

[41] T. 9:21-23; 41:22-24.

permissible under Maryland v. Wilson. 519 U.S. 408, 415 (1997) ("We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."). It was also justified by Officer Pittman's observations of Harrington when Officer Pittman initially encountered him. Before Officer Pittman ordered him out of the vehicle, Harrington was acting lethargic, swaying side to side with half-shut eyes, and suspiciously reaching around inside the vehicle. Emergency medical personnel also reported that Harrington was not acting normal and Officer Pittman suspected – based on this statement, a head nod from medical personnel, and his experience working with medical personnel and impaired individuals – that the medical personnel were uncomfortable dealing with Harrington.

Viewing the totality of the evidence in combination, these factors, along with others, such as the call reporting two men being "passed out" in a high volume drug activity area after having left and returned to the vehicle, reasonably suggested to Officer Pittman that Harrington may have been impaired by and possessing illegal drugs and posed a danger to the officer or medical personnel. Therefore, in addition to the rule from Maryland v. Wilson, these observations independently justified Officer Pittman's decision to order Harrington out of the vehicle. Florida v. Royer, 460 U.S. 491, 498 (1983) ("[C]ertain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime.") (citing Terry v. Ohio, 392 U.S. 1 (1968)).

**D. The pat-down**

The crux of Harrington's suppression motion is whether Officer Pittman's pat-down was constitutionally permissible. The Fourth Amendment of the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches and seizures

conducted outside the judicial process, without prior approval by judge or magistrate," are usually deemed "per se unreasonable" for purposes of the Fourth Amendment – "subject only to a few specifically established and well delineated exceptions." Minnesota v. Dickerson, 508 U.S. 366, 372 (1993). One well-established exception is derived from Terry v. Ohio, which permits a police officer to conduct a warrantless, limited pat-down search if the officer has a reasonable and articulable suspicion that the person is "armed and presently dangerous to the officer or to others." 392 U.S. at 24.

In judging the lawfulness of a Terry frisk, the "key is whether, under the circumstances, 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'" United States v. Cardona-Vicente, 817 F.3d 823, 827 (1st Cir. 2016) (quoting United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004)). For purposes of the Terry analysis, however, the term "armed" is not limited to traditional weaponry like firearms or knives and may include other objects that can be used as a weapon under the circumstances. See Terry, 392 U.S. at 29 (noting that a frisk "must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer") (emphasis added); United States v. Rush, No. 15-CR-105 SRN/LIB, 2015 WL 4364669, at *4 (D. Minn. July 13, 2015) (finding that a hypodermic needle could be treated as a dangerous weapon for purposes of a Terry analysis); People v. Gonzalez, 704 N.E.2d 375, 385 (Ill. 1998) (including needles among weapons justifying a Terry frisk).

"Evaluating whether an officer's suspicions are (or are not) reasonable is a fact-sensitive task" dependent on the totality of the surrounding circumstances of each police encounter. United States v. Chhien, 266 F.3d 1, 8 (1st Cir. 2001); see also United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005) ("To assess the legality of a protective frisk, a court looks at the

totality of the circumstances to see whether the officer had a particularized, objective basis for his or her suspicion."). "Deference is due to the experienced perceptions of the officers, . . . but not blind deference; these perceptions must be reasonable under an objective standard," and more than an officer's mere hunch is required. Cardona-Vicente, 817 F.3d at 827 (quoting United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000)); see also Terry, 392 U.S. at 27 (noting that "due weight must be given, not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience"). Finally, "reasonableness of official suspicion [for purposes of a pat-down] must be measured by what the officers knew before they conducted their search." Florida v. J.L., 529 U.S. 266, 271 (2000). As discussed below, several objective factors supported Officer Pittman's decision to pat Harrington down.

**Use of a hypodermic needle as a weapon.** Officer Pittman credibly testified that, based on the content of the call for service as well as his observations of Harrington at the scene, he suspected that Harrington was under the influence of opioids.[42] Based on his experience and training,[43] Officer Pittman understood that individuals who had recently used or were about to use opioids like fentanyl or heroin will often possess needles and use needles to inject the drug.[44] In Officer Pittman's experience, needles could be used as a weapon to stab someone and also

---

[42] T. 17:16-22; 20:1-10; 38:15-20; 53:19-21.

[43] T. 17:9-12. In Officer Pittman's experience with the Manchester Police Department at the time of his encounter with Harrington, he had encountered individuals using opioids or passed out under the influence of opioids dozens of times. Id. Officer Pittman had been a patrol officer for approximately five years at the time. T. 5:14. During his police academy training, as well as his training with the Manchester Police Department, Officer Pittman received training on investigating drug offenses. T. 5:7-15.

[44] T. 17:19-22; 36:19-21. See generally Second Evidentiary Hearing Testimony.

posed a danger – if undetected and not removed from a suspect's person – to emergency medical personnel or other officers when dealing with an impaired individual.[45] For example, Officer Pittman had heard of incidents where officers failed to search individuals suspected to be impaired by opioids, and medical personnel were endangered due to exposure to needles while the individual was being transported via ambulance.[46] At the time of the pat-down, it was still possible that Harrington would be transported by medical personnel via ambulance and medical personnel remained on the scene at least until Harrington was placed under arrest.[47] Officer Pittman further understood, based on his experience, that fentanyl can also be harmful if exposed to human skin or potentially fatal if improperly ingested.[48]

These factors, coupled with Officer Pittman's observation that Harrington's abnormal behavior was creating an uncomfortable concern for the medical personnel, created sufficient reasonable suspicion that Harrington could have been armed with a weapon (especially a hypodermic needle) and posed a danger to Officer Pittman or others.[49] See Rush, 2015 WL 4364669, at *4 ("The limited pat-down search for needles was permissible under Terry to ensure officer safety, since the hypodermic needles could easily be used as weapons.") (emphasis

[45] T. 18:4-12; 36:17-25; 37:1; 37:17-20; 39:1-2.

[46] T. 44:21-45:7.

[47] T. 45:2-4.

[48] T. 18:10-15.

[49] T. 36:17-25; 37:1, 17-20; 45:1-14. This ruling is not intended to suggest a bright-line rule that police officers encountering individuals suspected of opioid use are always permitted to conduct pat-down searches of those individuals. Nor does the court suggest that the dangers of skin exposure or ingestion of fentanyl or other opioids alone provide the requisite suspicion – in this case or otherwise – for officers to conduct pat-down searches. The court's ruling is instead limited to this specific set of facts and circumstances, based on the experience and training of this particular police officer and his observations of Harrington.

added); People v. Autry, 232 Cal. App. 3d 365, 368-69 (1991) (upholding pat-down search for needles and ruling that "a hypodermic needle in the possession of someone who might be a drug addict is a potentially deadly object" and "a hypodermic needle and syringe are easily employed as a weapon"); see also United States v. Carrillo, 16 F.3d 1046, 1049 (9th Cir. 1994) (finding, in context of public safety exception to Miranda rule, that safety risk of avoiding contact with syringes and toxic substances was "real and serious enough" to justify pre-Miranda question from police officer).[50] While Officer Pittman testified that he had no reason to believe that Harrington was "armed" in the traditional sense, that is, with a firearm, knife, or other type of projectile weapon, as discussed above, suspicion of possession of a firearm or knife is not required to support a Terry frisk.

Relatedly, as the government pointed out at the second evidentiary hearing, other sources including criminal codes and court rules support the court's finding that a needle wielded by a potentially drug-impaired individual could be considered a dangerous weapon in the Terry context. See, e.g., 25 L.P.R.A. § 466e (Puerto Rico statute criminalizing use of hypodermic needle or syringe to commit another offense against another person); 18 Pa. Stat. and Cons. Stat. Ann. § 2701(a) (4) (including, in definition of assault, using a concealed hypodermic needle to penetrate a law enforcement officer during an arrest or search); UTCR 6.150 (including

---

[50] While not binding on this court, decisions from several state courts support this ruling. See, e.g., Com. v. Kondash, 808 A.2d 943, 948 (Pa. Super. 2002) ("It is, therefore, reasonable to subject a suspected intravenous drug user properly detained at an investigatory stop to a limited pat down for needle possession to promote the officer's safety."); Perry v. State, 927 P.2d 1158 (Wyo. 1996) ("The object Officer Kirby encountered reasonably could have been a weapon, and he was justified in determining whether it was or was not. This justification is particularly pertinent in light of other decisions that acknowledge syringes or their needles can be deadly weapons like guns, knives or clubs."); Worthey v. State, 805 S.W.2d 435 (Tex. Crim. App. 1991) (holding Terry frisk warranted based on reasonable suspicion of needle possession).

hypodermic needles in list of weapons or other hazardous materials subject to special safety precautions in Oregon Uniform Trial Court Rules).

**Additional factors supporting reasonable suspicion.** Other considerations further support the finding that Officer Pittman had reasonable and articulable suspicion that Harrington may have been armed and posed a danger to others. These include the fact that persons suspected of drug use often exhibit unpredictable changes in behavior or erratic behavior, which, in Officer Pittman's experience, implicates "multiple" safety concerns.[51] In addition, there is often a correlation between drug offenses and violence, which suggests that an officer in Officer Pittman's position encountering two individuals suspected of being impaired on opioids (in a high crime, high drug activity area)[52] would have reason to be concerned for his safety. See, e.g., United States v. Arnott, 758 F.3d 40, 45 (1st Cir. 2014) ("The connection between drugs and violence is, of course, legendary.") (citing United States v. Randle, 815 F.2d 505, 508 (8th Cir. 1987)); United States v. Bustos-Torres, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction.").[53]

---

[51] T. 17:23 – 18:6.

[52] See United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987) (the court may consider "the characteristics of the area in which [police officers] encounter a vehicle" in determining the reasonableness of a Terry stop and frisk).

[53] To the extent that this encounter could be considered a "traffic stop," there is also support for the argument that traffic stops are "inherently dangerous." United States v. Shranklen, 315 F.3d 959, 962 (8th Cir. 2003) (citing United States v. Menard, 95 F.3d 9, 11 (8th Cir. 1996)). "The Supreme Court has frequently noted the inherent danger traffic stops pose to police officers and the consequent likelihood that minimally intrusive weapons searches will be reasonable." Menard, 95 F.3d at 11; see also Pennsylvania v. Mimms, 434 U.S. 106, 110 (1977) ("We have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile."). Furthermore, the "danger to an officer from a traffic stop is likely to

In addition, Harrington's suspicious movements both inside and as he was exiting the vehicle would have signaled to a reasonable officer in Officer Pittman's position that Harrington may have been armed and dangerous. Officer Pittman observed Harrington reaching around inside the vehicle before he ordered Harrington out, and as he ordered him out, Harrington also reached down to the floor area. Officer Pittman did not know what Harrington was reaching for, and suspected that he could be reaching for a weapon.[54] While these types of movements alone may or may not be enough to justify a pat-down depending on attendant circumstances, when viewed in combination with the other factors discussed above, they provide additional support for a finding of reasonable suspicion. See McKoy, 428 F.3d at 41 ("It is simply not reasonable to infer that a driver is armed and dangerous because the officers believe that he appears nervous and reaches toward the car's console when approached by police, even in a high-crime neighborhood."). Here, Officer Pittman's suspicion that Harrington was armed and dangerous was based on "more particularized indicia of danger" than simply a reach to the vehicle's console or the fact that he encountered Harrington in a high crime area. Cardona-Vicente, 817 F.3d at 829.[55]

---

be greater when there are passengers in addition to the driver in the stopped car." Wilson, 519 U.S. at 414.

[54] T. 20:19-25 – 21:1-6.

[55] After Officer Pittman ordered Harrington to put his hands on top of his head, Harrington began to comply but lowered one of his hands to his pant pocket. The government argues that the court can consider this alleged noncompliance and gesture as an additional factor supporting the frisk because it occurred before Officer Pittman physically began patting Harrington down. Based on the other factors discussed above, there was ample reasonable suspicion to justify the frisk, so the court need not and will not include Harrington's gesture outside of the vehicle in its Terry analysis. In any event, Officer Pittman testified that this gesture did not factor into his decision to conduct the pat-down. T. 43:17-18.

The pat-down was supported by specific, objectively rational justifications, and not merely Officer Pittman's "pure gut feelings" or a hunch that Harrington may have been armed and dangerous. United States v. McGregor, 650 F.3d 813, 821 (1st Cir. 2011). It therefore did not violate the Fourth Amendment and the court will not suppress the controlled substances seized from Harrington as a result of the pat-down.

**E. Harrington's admission to drug possession**

Lastly, Harrington moves to suppress his answer of "drugs" in response to Officer Pittman's question about the object in Harrington's waistband. He argues that the statement should be suppressed because it was obtained through a custodial interrogation without the benefit of Miranda warnings. The prosecution responds that the statement should not be suppressed because the brief question and answer between Harrington and Officer Pittman was not a custodial interrogation. No custodial interrogation occurred.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The prosecution thus "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444. "It is well established that Miranda warnings must be communicated to a suspect before he is subjected to 'custodial interrogation.'" United States v. Nai Fook Li, 206 F.3d 78, 83 (1st Cir. 2000). "Both 'custody' and 'interrogation' must be present to require Miranda warnings." United States v. Molina-Gomez, 781 F.3d 13, 21–22 (1st Cir. 2015). Here, the court is skeptical that a single question from an officer in the context of a Terry frisk amounts to an interrogation under the

Fifth Amendment, but, even if it did, this case is missing the custody element of the Miranda test.

Persons temporarily detained as part of roadside investigatory detentions, such as the one involving Harrington, are not "in custody" for purposes of Miranda or the Fifth Amendment. Berkemer v. McCarty, 468 U.S. 420, 440 (1984); Pennsylvania v. Bruder, 488 U.S. 9, 11 (1988) (same); see also Arnott, 758 F.3d at 45 ("At their inception, Terry stops generally do not require Miranda warnings."). Instead, Terry stops "afford officers some latitude to question witnesses about issues for which the officers have reasonable suspicion," and here, Officer Pittman's sole question to Harrington was "directly tied to his legitimate discovery of contraband on [Harrington's] person." Arnott, 758 F.3d at 45 (officer's roadside questioning of suspect was non-custodial) (citing United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999)).

This Terry investigatory detention and frisk did not have the requisite "restraint[s] on freedom of movement of the degree associated with a formal arrest," and was therefore not a custodial interrogation. United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001). Officer Pittman placed Harrington's hand on the top of his head to facilitate the pat-down. Such a restraint cannot be equated with a formal arrest. And the only restraint on Harrington's freedom of movement that was arguably equivalent to a formal arrest – Officer Pittman handcuffing Harrington – came after Harrington made the statement about the drugs. The court will therefore not suppress Harrington's statement.[56]

[56] Even if Officer Pittman's question to Harrington was a custodial interrogation that required Miranda warnings, which it was not, that would only result in the suppression of the statement "drugs," but not the drugs themselves, which is not particularly helpful to Harrington. See Michigan v. Tucker, 417 US 433, 451 (1974).

## IV. Conclusion

For the reasons set forth above, Harrington's motion to suppress[57] is DENIED.

**SO ORDERED.**

Joseph N. Laplante
United States District Judge

Dated: August 31, 2021

cc: Joachim H. Barth, AUSA
Stanley W. Norkunas, Esq.

[57] Doc. no. 8.